UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DOMINIQUE DARNELL ROBINSON,

Plaintiff,

v. Case No. 24-cv-0798-bhl

DEWAYNE CARRINGTON et al.,

Defendants.

---

**DECISION AND ORDER**

---

Plaintiff Dominique Darnell Robinson, who is incarcerated at the Jackson Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on claims that Defendant correctional officer Dewayne Carrington punished him by denying him lunch and that Carrington and Defendant correctional officer Josh Rupp were deliberately indifferent to his complaints of dizziness and chest pain. He is also proceeding on claims that Defendant nurses Katherine Satterfield and Leah Donovan were deliberately indifferent to the injuries he suffered after he fainted. On March 24, 2026, the Defendant nurses filed a motion for summary judgment. Dkt. No. 62. The Defendant correctional officers filed their own motion for summary judgment on May 14, 2026. For the reasons explained below, the Court will grant the Defendants' motions and dismiss this case.

**PROCEDURAL ISSUES**

On March 25, 2026, the day after the Defendant nurses filed their summary judgment motion, the Court entered a notice and order advising Robinson that under Civil L. R. 56(b)(2), he must respond to each proposed fact by agreeing with it or explaining why he disagrees with it. The Court explained to Robinson that he must support every disagreement by citing to evidence. Finally, the Court warned Robinson that if he did not respond to a proposed fact, the Court would assume that he did not dispute the proposed fact and would accept the proposed fact as true, regardless of contrary statements in a declaration. Dkt. No. 67. On June 25, 2026, Robinson filed responses to about half of the Defendant nurses' proposed facts. Robinson included case citations and arguments in his responses, but the responses were not made under penalty of perjury nor did Robinson cite to evidence, despite the Court advising him that he was required to do so. Finally,

Robinson did not correctly reproduce each of the Defendant nurses' proposed facts. *Compare, e.g.,* Dkt. No. 64 at ¶2 *with* Dkt. No. 95 at ¶2.

On May 18, 2026, after the Defendant correctional officers filed their summary judgment motion, the Court entered a second notice and order again advising Robinson of his obligations under Federal Rule of Civil Procedure 56 and Civil L. R. 56. On August 31, 2026, Robinson filed 100 proposed statements of fact, which he signed under penalty of perjury pursuant to 28 U.S.C. §1746. Less than half of the proposed facts were relevant to Robinson's claims against the Defendant correctional officers—the majority of them related to Robinson's claims against the Defendant nurses. Robinson did *not* respond to the Defendant correctional officers' proposed findings of fact. In a cover letter, Robinson asked the Court to "be lenient with him" because he had "no time to get proper responses to defendants['] statements of fact" because "the Judge made it clear there will be no more extensions." Dkt. No. 107-1.

The Court will deem admitted the Defendant nurses' proposed facts to which Robinson did not properly respond and all of the Defendant correctional officers' proposed facts based on Robinson's failure to respond to them. Robinson was twice informed of the consequences of failing to respond to the Defendants' proposed facts. His assertion that he had "no time" to prepare responses to the Defendant correctional officers' proposed facts is incorrect and does not excuse his non-compliance. The Defendant correctional officers filed their summary judgment motion on May 14, 2026, which means Robinson had more than three months to prepare his responses. Rather than complying with the rules and the Court's orders, Robinson chose to prepare his own proposed facts, which the Court will accept as a declaration given that he signed them under penalty of perjury. But as the Court twice informed Robinson, failure to respond to a proposed fact, would result in the Court accepting the proposed fact as true *regardless of contrary statements in a declaration*. It is unclear why Robinson chose not to follow Civil L. R. 56, but he bears the consequences for that choice. *See Phoneprasith v. Greff*, Case No. 21-3069, 2022 WL 1819043 (7th Cir. June 3, 2022) (holding that a district court is entitled to deem unopposed facts admitted under Civil L. R. 56(b)(4) regardless of a non-movant's detailed opposition brief, affidavit, and exhibits); *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (same).

Moreover, the Court will not consider Robinson's proposed facts that are relevant only to his claims against the Defendant nurses. Dkt. No. 107 at ¶¶44-100. The briefing on the Defendant nurses' summary judgment motion was complete on July 6, 2026, when the Defendant nurses filed their reply brief. Robinson filed his proposed facts nearly two months later, on August 31, 2026.

Because briefing was complete on the Defendant nurses' summary judgment motion, the Defendant nurses were deprived of the opportunity to respond to Robinson's proposed facts. The Court will therefore disregard those proposed facts.

With these considerations in mind, the Court turns to the substance of Defendants' summary judgment motions.

## BACKGROUND

In 2006, Robinson was convicted and given a lengthy prison sentence to be followed by a period of extended supervision. According to Department of Correction records, he was released on extended supervision on October 18, 2022. On October 1, 2023, he was admitted to the Milwaukee Secure Detention Facility on a hold and released less than a week later. Three days after being released, on October 8, 2023, Robinson was booked into the Milwaukee County Jail on new charges as well as for violating the terms of his supervised release. At that time, the Defendants worked at the jail—Carrington and Rupp as correctional officers and Donovan and Satterfield as nurses. Dkt. No. 76 at ¶¶2-3; Dkt. No. 64 at ¶1-3.

On November 13, 2023, breakfast was served to the inmates on Robinson's pod sometime before 8:00 a.m. Robinson did not complain about not getting a breakfast tray. At about 9:30 a.m., Robinson was informed that he had a contact visit. The visit lasted for about an hour, from 9:48 a.m. until 10:43 a.m. Robinson had not returned to his cell by the time lunch was served, and at 12:17 p.m. Carrington was informed by another officer that Robinson had not received a lunch tray. Carrington stated that he would get a lunch tray for Robinson. Carrington asserts that, around that time he was having issues with rule violations and keeping up with numerous requests and tasks, so he closed the pod. Robinson asserts that, on his way back to his cell, he asked Carrington to get him a lunch tray, and Carrington stated he would. At 12:42 p.m. Carrington called the kitchen to request a tray for Robinson and was told that no more trays were available so someone would have to go to the kitchen to pick up a bagged lunch. At 12:44 p.m. an officer called Carrington and asked him why the pod was closed. Carrington asserted that he would log the reasons and reopen the pod. Dkt. No. 76 at ¶¶16-38; Dkt. No. 112 at ¶¶7, 9, 11-12.

At about 1:11 p.m. Carrington called a medical emergency and reported that an inmate was having chest pains. The pod was temporarily closed again but reopened once the medical emergency was cleared. Robinson asserts that once he was again allowed out of his cell, he told another officer that he still hadn't eaten lunch and Carrington was refusing to feed him. Robinson asserts that he saw the officer talk to Carrington, and once things had settled down in the pod, he

again asked Carrington to get him a lunch tray. According to Robinson, Carrington told him that, because Robinson had complained, he was not going to call for his lunch tray. Carrington highlights that he had already called the kitchen and had been informed there were no lunch trays left. Dkt. No. 76 at ¶¶39-40; Dkt. No. 112 at ¶¶17-18, 22.

Rupp started his shift at 2:00 p.m. At this time, Robinson's floor was closed down yet again, so Robinson was in his cell. Robinson asserts that he started to feel lightheaded and have chest pains at around 3:00 p.m. A little after 3:30 p.m., a nurse began to hand out medication on Robinson's floor. There is no record of Robinson alerting the nurse to his symptoms, and Robinson does not recall trying to interact with her. Robinson asserts that he repeatedly pressed his emergency call button, but there is record of only one intercom call from Robinson's cell at 3:53 p.m. Robinson asserts that when he pressed his emergency call button he saw both Carrington and Rupp at the officers' desk. Rupp asserts that he had been reassigned to occupant movement and was not assigned to be the housing officer. He also explains it is unlikely that more than one officer would be at the desk at the same time, especially during a lockdown. Robinson asserts that Rupp and Carrington did not respond, so he started to yell and kick and bang on his door to get their attention. According to Robinson, Rupp asked him what his medical emergency was, to which Robinson stated he was having severe chest pains and was feeling lightheaded. Robinson asserts that neither Carrington nor Rupp responded. He asserts that he "built up enough strength to push his medical call button one last time before losing consciousness and fainting." Dkt. No. 76 at ¶42-52; Dkt. No. 112 at ¶¶24-37.

At about 4:40 p.m., an officer who was handing out dinner trays called a medical emergency after Robinson appeared to be unresponsive. Medical staff, who Robinson asserts included the Defendant nurses, arrived at Robinson's cell within three minutes, at which time Robinson was conscious, lying on the ground with his hand over his forehead, and responding to verbal cues. According to the medical records, Robinson reported that he was "dizzy and fell," hitting his head "on the top of the back of his head." He also stated that the back and front of his head hurt. Medical staff noted no bumps, bleeding, or bruising. They also noted that Robinson was alert and oriented, and that his pupils were equal and reactive. Robinson was transported to the clinic where he was further examined by Nurse Practitioner Brandt (who is not a Defendant), who examined him, checked his vitals, gave him a Boost nutritional supplement and Tylenol, and educated him on the importance of eating and staying hydrated. Robinson was cleared to return to his housing unit and staff ordered ice packs, Tylenol, and neuro checks. His medical records

from that day make no mention of Robinson reporting chest pain. Robinson was instructed to notify medical staff if any of his symptoms worsened or changed. He agreed with the proposed plan. Dkt. No. 76 at ¶56-66; Dkt. No. 95 at ¶¶10-15.

The next day, on November 14, 2026, Robinson had a neurological assessment that was normal. The day after that, he submitted two health services requests in which he stated he had suffered a "severe head injury" and that the Tylenol and ice packs were not working. He requested either a CT scan or an MRI. The next day, on November 16, 2023, Robinson was examined by a non-Defendant provider who assessed his symptoms and noted "low suspicion" that Robinson had suffered a head injury because his physical and neurological examinations were normal. The provider determined there was no need for a CT scan or MRI, but he referred him for an x-ray of his cervical and lumbar spine. He also maintained the prescription for Tylenol and ordered neurological checks for an additional three days. Two days later, Robinson submitted another health services request form asking for a CT scan. A non-Defendant provider noted that Robinson was on daily neurological checks and no abnormality had been reported. The provider again notified Robinson that a CT scan was not indicated. Dkt. No. 76 at ¶¶66-71; Dkt. No. 95 at ¶¶16-24.

On November 21, 2023, the results of the x-ray were returned and were negative for injury, revealing only age-related degeneration. Robinson continued to submit health services requests complaining about severe head and/or back pain and requesting a CT scan or MRI. Health staff explained in response to his requests that his neurological checks showed no concern and further diagnostic testing was not medically necessary. During a sick call, a non-Defendant provider informed Robinson that his fainting episode was caused by dehydration. The provider also noted that Robinson was neurologically intact and discussed with him the signs of traumatic brain injury, such as lethargy, vomiting, dilated pupils, changes in vital signs, and difficulty walking, none of which Robinson exhibited. Dkt. No. 76 at ¶¶72-77; Dkt. No. 95 at ¶¶25-28.

On December 4, 2023, Robinson was seen by Donovan who performed physical and neurological examinations and explained that she agreed with the other providers who concluded that there was no clinical need for a CT scan or MRI. She noted that, based on Robinson's reports of headaches and blurry vision, he likely had post-concussion syndrome. Nurse Donovan prescribed naproxen and ordered a follow-up examination in two to three weeks. She also ordered that Robinson be transferred to ophthalmology if his blurry vision persisted and that Robinson consult with the onsite physical therapist. On December 12, 2023, a non-Defendant provider

explained to Robinson that this diagnosis was made based only on his reports of his symptoms and not on diagnostic testing. The provider also explained that, given his normal neurological findings, imaging may not yield any clinically significant data. Dkt. No. 76 at ¶¶78-80; Dkt. No. 95 at ¶¶29-31.

On December 18, 2023, medical staff responded to Robinson's complaints of dizziness and numbness in his right arm. Robinson told the non-Defendant provider that he had been reading about the signs of symptoms of post-concussion syndrome and he wanted to be examined because he had some of the signs and symptoms. He also stated he wanted a CT scan of his neck. Robinson was again evaluated two days later. He reported no dizziness, walked in his cell without issue, and did not appear to be in any distress. On December 22, 2023, Robinson was seen yet again by a non-Defendant provider for a follow-up appointment. The provider performed a physical and neurological examination, which did not demonstrate any clinical need for a CT scan or MRI. Nevertheless, given Robinson's persistent requests, the provider acquiesced and referred Robinson for a CT scan. The CT scan occurred on January 10, 2024, and the results were negative for any abnormality. Dkt. No. 76 at ¶¶81-84; Dkt. No. 95 at ¶¶32-37.

Convinced diagnostic testing would confirm an injury, Robinson set his sights on an MRI. Robinson stated to health services providers that he was in extreme pain in his head, neck, and back. He stated that the medication he was on was not working, and he could not sleep. On March 14, 2024, because of his repeated requests, a non-Defendant provider referred Robinson for an MRI of his spine. The MRI results showed no injury, only degenerative changes. Dkt. No. 76 at ¶¶85-89; Dkt. No. 95 at ¶¶38-42.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show

that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Robinson asserts that his rights were violated when Carrington refused to get him lunch after he learned that Robinson had not been given a lunch tray. He also asserts that Carrington and Rupp violated his rights when they failed to call a medical emergency after he informed them that he felt dizzy and had chest pain. Finally, he asserts that Donovan and Satterfield violated his rights when they failed to adequately treat him after he fainted and hit his head. At the relevant time, Robinson was at the jail on a Division of Community Corrections hold—he had been convicted of a crime and had served a lengthy prison sentence, after which he was released on extended supervision to serve the remainder of his sentence in the community, but because Robinson did not comply with the terms of his extended supervision, he was reincarcerated. Robinson *also* was at the jail because he faced new criminal charges. Robinson was therefore both a convicted prisoner and a pretrial detainee.

Claims by convicted prisoners are governed by the Eighth Amendment, whereas claims by pretrial detainees are governed by the Fourteenth Amendment. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). The standards under these Amendments differ, and although the Seventh Circuit has acknowledged district courts' uncertainty regarding which Amendment applies when a plaintiff is both a prisoner and pretrial detainee, the appellate court has not definitively addressed the issue. *See Estate of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017). Pretrial detainees are entitled to a more lenient standard because they have not yet been convicted of a crime and therefore cannot be punished. This is not true of Robinson, who had been convicted of a crime and was still serving a sentence. The most that can be said of Robinson is that he had not yet been convicted of *additional* crimes, but that circumstance should not entitle him to the protections of the Fourteenth Amendment. Accordingly, the Court concludes that Robinson's claims arise under the Eighth Amendment. *See Watkins v. Wheeler*, No. 24-CV-884, 2026 WL 36065, at *4 (E.D. Wis. Jan. 6, 2026) (even though plaintiff faced pending charges, the fact is that on the day of the incident, he was a convicted prisoner).

Robinson asserts that Carrington's failure to retrieve a lunch for him constitutes "cruel and unusual punishment," which is prohibited under the Eighth Amendment. It does not. The Seventh

Circuit has explained that "extreme deprivations" are required to make out a claim under the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). After all, "restrictive and even harsh" conditions are "part of the penalty that criminal offenders pay for their offenses." *Rhodes v. Chapman*, 452 U.S. 520, 561 (1979). Further, "it is not just the severity of the [condition], but the duration of the condition, which determines whether the conditions of confinement are unconstitutional." *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997). It is undisputed that Robinson missed a single meal, which cannot reasonably be characterized as an "extreme" deprivation. Moreover, Carrington did not "deny" Robinson his lunch tray. Robinson was not in his cell when the lunches were delivered. When Carrington was informed that Robinson missed the delivery of his lunch, he called the kitchen to ask that the lunch be delivered, but kitchen staff told him there were no more trays left so someone would have to go to the kitchen to pick up a bagged lunch. The fact that Carrington did not drop everything to solve a problem that he did not create does not plausibly suggest that he was "punishing" Robinson. And, even if Carrington could have left the unit to retrieve a bagged lunch from the kitchen, his failure to do so did not deny Robinson the minimal civilized measures of life's necessities or create an excessive risk to Robinson's health and safety. *See Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Carrington is therefore entitled to summary judgment on this claim.

Robinson next asserts that Carrington and Rupp were deliberately indifferent to his serious medical condition when they refused to call a medical emergency in response to his complaints of chest pain and dizziness. The Court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment; it asks: 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016). Robinson's claim fails on both elements.

First, no jury could reasonably conclude that Robinson suffered from an objectively serious medical condition. The Seventh Circuit has "found the following circumstances to be indications that a prisoner has a serious medical need: The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008). Robinson asserts that he "felt" and "believed" he was having a heart attack, but the undisputed record shows that he was not. A provider later concluded that Robinson had fainted because he was dehydrated, a condition

that can be easily addressed without medical intervention by drinking water. Robinson also acknowledges that he was hungry from not having eaten lunch and that he was agitated from being ignored, which caused him to yell and bang and kick his door. But being lightheaded from missing a single meal and emotionally distraught because one's demands are not being met is not an objectively serious medical condition. While Robinson may have "felt" in the moment that something more serious was occurring, the medical evidence shows that it was not.

Nor could a jury reasonably conclude from the totality of the circumstances that Rupp and Carrington were deliberately indifferent to Robinson's needs. Robinson asserts that he informed Carrington repeatedly throughout the morning that he had not received his lunch tray and he was hungry. Robinson even elevated his complaints to other officers, who then spoke to Carrington. Robinson doggedly persisted in alerting Carrington to what he wanted, and his opportunity to continue to do so was limited once the pod was locked down and Robinson was confined to his cell. Carrington explains that it is not uncommon for inmates to use their emergency call buttons for improper purposes, such as continuing to complain about missing lunch. Robinson insists that Rupp and Carrington should have responded immediately to the pressing of his emergency call button and his complaints of distress, "[b]ut prison guards are neither required nor expected to believe everything inmates tell them." *Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014). And even if Rupp and Carrington were mistaken about Robinson's true motives for pressing his call button, yelling, and banging and kicking his door, their mistaken belief does not equate to deliberate indifference. *See, e.g., Whiting v. Wexford Health Sources, Inc*., 839 F.3d 658, 662 (7th Cir. 2016) ("[W]ithout more, a mistake in professional judgment cannot be deliberate indifference."); *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) ("[A] defendant's inadvertent error, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation."). Rupp and Carrington are therefore entitled to summary judgment.

Finally, Donovan and Satterfield are entitled to summary judgment on Robinson's claims that they were deliberately indifferent to his serious medical condition after he fainted. According to Robinson, both nurses responded to his cell within minutes of being alerted that he had fainted. The undisputed medical records show that Robinson's condition was assessed, and he was observed to be alert and oriented and with pupils that were equal and reactive. After determining Robinson could be safely moved, he was transported to the health services clinic where he was further assessed and treated by a nurse practitioner. No jury could reasonably conclude from this

limited interaction that Donovan and Satterfield were deliberately indifferent to Robinson's welfare immediately after he fainted.

Robinson also asserts that a few weeks after he fainted, he was examined by Nurse Donovan. By this time, Robinson had been repeatedly evaluated by multiple providers, both physically and neurologically. All assessments were normal. Donovan nevertheless took Robinson's complaints seriously, performing yet another physical and neurological examination. Despite the results being normal, she acknowledged Robinson's complaints and prescribed Naproxen for his pain. She also ordered a follow-up appointment, a referral to ophthalmology should his blurry vision continue, and a consult with the onsite physical therapist. No jury could reasonably conclude from this comprehensive response that Donovan was deliberately indifferent to Robinson's condition.

The medical records show that the remainder of Robinson's interactions were with other providers. Robinson asserts that Donovan and Satterfield were in the room or nearby when he interacted with other providers, but §1983 requires that an individual be personally involved in the alleged constitutional violation. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). The mere fact that Donovan and Satterfield may have been in the health services clinic when Robinson was being treated by other providers is insufficient for a jury to reasonably conclude that they were involved in other providers' treatment decisions. In any event, nurses are entitled to defer to the treatment decisions of providers unless they pose obvious and serious risks to an inmate's health and safety. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012). Nothing in the records suggests that the course of treatment prescribed by Robinson's providers posed any risk to his health and safety, let alone a serious risk. And the mere fact that Robinson may have disagreed with their conclusions does not change that analysis. A disagreement between a prisoner and medical staff about proper treatment is not enough to constitute deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("An MRI is simply a diagnostic tool, and the decision to forego diagnostic tests is a classic example of a matter of medical judgment."). Accordingly, Donovan and Satterfield are entitled to summary judgment.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' summary judgment motions (Dkt. Nos. 62, 74) are **GRANTED** and this case is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that the Defendant correctional officers' motion to restrict documents (Dkt. No. 81) is **DENIED**. Robinson's medical records were placed into the record by other parties without Robinson's objection.

Dated at Milwaukee, Wisconsin on September 24, 2026.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.